**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RODNEY ALLEN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 26-cv-3123** |
| | : | |
| **JOSEPH TERRA,** *et al.*, | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**Joseph F. Leeson, Jr.**                                                                                    **July 9, 2026**
**United States District Judge**

Plaintiff Rodney Allen, an inmate currently confined at SCI Phoenix, brings this *pro se*

civil action alleging that his constitutional rights were violated when he was denied appropriate

medical care.  The Court will grant Allen's application to proceed *in forma pauperis* and will

screen his Complaint[1] pursuant to 28 U.S.C. § 1915(e)(2)(B).  As explained below, the

Complaint will be dismissed and Allen's motion for appointment of counsel will be denied.

**I.      FACTUAL ALLEGATIONS**

Allen represents he is "an insulin dependent diabetic with several diabetic related medical

illnesses and complications resulting from . . . severe 'hyperglycemia'" and alleges that

Defendants failed to provide adequate medical care at SCI Phoenix.  ECF No. 1. at 4.  Named as

Defendants are: Superintendent Joseph Terra; Deputy Superintendent Charles Hensley;

Correctional Health Care Administrator Britney Huner; Physician Assistant Ms. Ashley; Dr.

---

[1]      Allen commenced this matter by filing a Complaint, ECF No. 1, a motion for
appointment of counsel, ECF No. 2, and a motion for leave to file an amended complaint that
includes additional factual allegations, *see* ECF No. 3.  Because ECF No. 1 and ECF No. 3 were
submitted in the same mailing, the Court will grant Allen's motion to amend and will construe
ECF No. 1 and ECF No. 3 together as the initial Complaint.  The Court adopts the pagination
supplied by the CM/ECF docketing system to the filings in this case.

Annino; Dr. Anthony Letizio; Chronic Care Assistant Nurse Pinky Bora; and Physician Assistant Ms. Beverly.  ECF No. 1 at 2-4; ECF No. 3 at 2.  They are sued in their individual and official capacities.  ECF No. 1 at 4.  Allen claims he suffered physical injuries, and seeks injunctive relief, as well as money damages.  ECF No. 1 at 12-14, 16; ECF No. 3 at 3-4.

Allen alleges as follows:  On September 25, 2024, he filed a sick call slip requesting to see "a Doctor or/a Podiatrist (foot doctor) because [he] had a sever[e] case of black discolored fungal toe nails, coupled with sever[e] ingrown toe nail infection, with a dire need to have several toe nails removed."  ECF No. 1 at 4.  Allen represents that, due to hyperglycemia, he has a severe case of neuropathy in his legs and feet, which causes "excruciating pain, cramps and numbness, with difficulty walking daily without the use of a cane, and at times without the use of a wheelchair."  *Id.*

Allen was called to the medical department on October 3 in response to the sick call slip and was seen by Dr. Annino, who examined his feet "and acknowledged the seriousness of [his] foot problems."  *Id.* at 5.  He avers that Dr. Annino, instead of providing a referral to a podiatrist and/or neurologist or providing "any immediate independent medical treatment," called the medical department triage for Dr. Letizio to examine Allen's feet.  *Id.*  Allen explained his medical concerns to Dr. Letizio and requested a referral to a podiatrist.  *Id.*  According to Allen, Dr. Letizio responded, "you're never going to see a Podiatrist (foot doctor), you can file a grievance, call a lawyer and/or do what ever you want to do."  *Id.*  He avers that Dr. Letizio instructed Dr. Annino to "just trim his toe nails, and get him out of here."  *Id.*  He states that Dr. Annino "did just that" and "they" did not provide him with "pain medication or anything."  *Id.*

That same day, Allen filed grievance #1111495, "alleging medical staff 'deliberate indifference' to a serious medical need, and denial of adequate diabetic foot care, and treatment

for other diabetic medical related complications, and illnesses." *Id.* The following day, Allen was called to the medication line and was given clotrimazole cream, which he states is a substitute for Lotrimin, is a treatment for athlete's foot, jock itch, and ringworm, and is to relieve itching and burning. *Id.* On October 10, Allen was again called to the medication line and given an additional tub of the cream. *Id.* at 6. Allen used both tubs of the cream to no avail and asserts that the package instructions indicate that it is not effective on the scalp or nails. *Id.* at 5.

On October 28, Allen met with Pinky Bora, a chronic care nurse, in the medical department to discuss his neuropathy symptoms. *Id.* at 6. They discussed several oral medications and Bora ultimately prescribed Tileptal, 150 mg twice per day. *Id.* Allen contends that this medication is an anticonvulsant, it is used in the treatment of seizures, and it was not effective for the treatment of his diabetes-related pain symptoms. *Id.*

On October 28, Allen also received an Initial Review Response from the facility grievance coordinator denying his initial inmate grievance, and he filed an appeal to the facility manager on October 30. *Id.* The initial denial was upheld in a Facility Manager Response dated November 8, 2024. *Id.* Allen then filed a second-level appeal to the Secretary's Office of Inmate Grievance and Appeals on November 15, which was referred to the Health Care office for further review on December 30. *Id.* at 7.

Allen filed another sick call slip on January 26, 2025,[2] "seeking medical treatment for some serious medical issues, and some long term complications relating to [his] diabetes and 'hyperglycemia' related illnesses and etc." *Id.* This sick call was rescheduled to February 3. *Id.* In the meantime, Allen was sent to the medical department on January 30 to see Dr. Annino and

---

[2]    Allen attached to the Complaint copies of the sick call request slips dated January 26, 2025, *see* ECF No. 1 at 26, 33-34, May 1, 2025, *see id.* at 35-36, and May 7, 2025, *see id.* at 37-38; ECF No. 3 at 6-7.

have his toenails clipped.  *Id.*  On February 3, when Allen went to the medical department regarding the January 26 sick call slip, he met with Ms. Lillian, a physician's assistant, who informed him that he was scheduled for lab work on February 14 and for the chronic care clinic on March 1.  *Id.*  Because Allen was not called for lab work on February 14, he filed another sick call slip that day, and was seen by Ms. Beverly, a physician's assistant, on February 17.  *Id.* at 7-8.  Ms. Beverly informed Allen that the lab work was scheduled for February 27, and reminded him that he was scheduled for chronic care clinic on March 1, at which time they would address all of the concerns detailed in his January 26 sick call slip.  *Id.* at 8.  Allen went to the medical department on February 27 and had blood drawn.  *Id.*  Because Allen was not called for chronic care clinic on March 1, he submitted a sick call slip on March 3 regarding the omission.  *Id.*

On March 7, Allen went to a dental sick call appointment to have a tooth extracted because his teeth were becoming loose "because of gum disease complications related to [his] 'hyperglycemia' diabetes high blood sugar, and high A1c level."  *Id.*  On March 8, Allen filed another sick call slip explaining his diabetic-related medical complications and that he "was experiencing excruciating pain[,] cramps, and numbness in [his] legs and feet" and that he was having difficulty walking.  *Id.*  On March 10, Allen was called to the medical department in response to his sick call slip and was seen by Ms. Beverly.  *Id.* at 9.  Allen was told that his glucose level was high, at 285, and that while she did not know what his A1c level was at that time, in August it had been 9.5.  *Id.*  Ms. Beverly told Allen that she would schedule him for a chronic care clinic appointment and he could further discuss his concerns then.  *Id.*

On March 12, Allen went to the medical department for a chronic care clinic appointment with Ms. Ashley, who took his "vital signs, weight and etc." and discussed Allen's diabetic-related illnesses with him.  *Id.*  When he requested his blood test results, Allen was told that his

4

A1c was 9.5, cholesterol was 114, triglycerides were 60, bad cholesterol was 69, good cholesterol was 33, and "thyrodes was 4.366." *Id.* Allen requested to be prescribed a diabetic diet but the request was denied, although Ms. Ashley authorized the continued use of a cane and wheelchair. *Id.* On March 20, Allen went to the medical department for an eye examination for diabetes-related eye disease. *Id.* Nonetheless, Allen asserts that "at this juncture . . . [he] had not received any adequate medical care and/or treatment for his serious medical needs, and he has suffered excruciating pain and discomfort as a result of medical staff['s] 'deliberate indifference' and denial of adequate treatment to a serious medical need." *Id.*

On April 24, Allen received the final notification that his grievance appeal was denied. *Id.* at 10.[3] On May 1, Allen filed another sick call slip "requesting treatment for [his] serious medical needs." *Id.* On May 6, Allen was called to the medical department to see Nurse Ms. Vern for a Metabolic Monitoring appointment and vital signs check-up. (*Id.*) He inquired about the May 1 sick call slip and was told by Ms. Vern that the records showed he did not appear, although Allen contends that the medical department did not call for him that day. (*Id.*) On May 7, Allen filed another sick call slip that was a duplicate of the May 1 slip, requesting to see a podiatrist and neurologist to receive treatment "and proper care." *Id.* He explained that he was suffering from a severe case of neuropathy which caused excruciating pain and difficulty walking, and that he had infected ingrown toenails. ECF No. 3 at 2. Allen was called to the medical department on May 12 to address the sick call slip and met with Defendant Beverly. *Id.* He again requested to be seen by a podiatrist and a neurologist, and requested a prescription for neurontin pain medication. *Id.* Allen asserts that Defendant Beverly "denied to provide and/or

---

[3]     Allen contends that he exhausted administrative remedies with respect to Grievance #111495, *see* ECF No. 1 at 10, and attached to the Complaint the grievance and responses through the appeals process, *see id.* at 18-20, 22-24, 28-31.

refuse to recommend any referrals" to a podiatrist or neurologist.  *Id.* at 2-3.  He contends that Defendant Beverly was deliberately indifferent to his serious medical needs because "she was totally aware" that if he "was not promptly provided with proper adequate medical treatment and care" from a podiatrist and a neurologist, "that he could risk permanent disability."  *Id.* at 3.  He asserts that as of the filing of the Complaint, he had not been referred to a specialist.  ECF No. 1 at 10.

## II.     STANDARD OF REVIEW

The Court will grant Allen leave to proceed *in forma pauperis* because it appears that he is incapable of prepaying the fees to commence this civil action.[4]  Accordingly, 28 U.S.C. § 1915(e)(2)(B) requires the Court to dismiss the Complaint if, among other things, it fails to state a claim.  The Court must determine whether the Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007)); *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).  At the screening stage, the Court will accept the facts alleged in a *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether that complaint contains facts sufficient to state a plausible claim.  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024).

As Allen is proceeding *pro se*, the Court construes his allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).  However, conclusory allegations do not suffice.  *Iqbal*, 556 U.S. at 678.

---

[4]     Since Allen is a prisoner, he will be obligated to pay the filing fee in installments in accordance with the Prison Litigation Reform Act.  *See* 28 U.S.C. § 1915(b).

"[P]ro se litigants still must allege sufficient facts in their complaints to support a claim." *Vogt*, 8 F.4th at 185 (quoting *Mala*, 704 F.3d at 245). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation marks and citations omitted). Additionally, the Court must review the Complaint and dismiss the matter if it determines that subject matter jurisdiction is lacking. *See* Fed. R. Civ. P. 12(h)(3); *Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.*, 810 F.3d 116, 122 n.6 (3d Cir. 2016) (explaining that "an objection to subject matter jurisdiction may be raised at any time [and] a court may raise jurisdictional issues *sua sponte*").

## III.    DISCUSSION

Allen claims that his rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated, as well as his rights under state law. *See* ECF No. 1 at 1, 11-16. Even upon a liberal reading of the Complaint, however, Allen has failed to allege a plausible basis for a claim against any named Defendant.

### A.    Federal Law Claims

Allen brings claims pursuant to 42 U.S.C. § 1983, the vehicle by which federal constitutional claims may be brought against state actors in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Eighth Amendment's prohibition of cruel and unusual punishment governs claims brought by convicted inmates challenging their conditions of confinement. *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) (citation omitted). The Eighth Amendment requires

prisons to provide adequate food, shelter, clothing, and medical care.  *Montanez v. Price*, 154 F.4th 127, 140 (3d Cir. 2025) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), *cert. denied sub nom. Pennsylvania v. Montanez*, No. 25-1073, 2026 WL 1718015 (U.S. June 15, 2026).

To state an Eighth Amendment claim based on the failure to provide constitutionally protected medical treatment, a prisoner must allege facts reflecting that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer*, 511 U.S. at 834-35.  As to the objective element of this Eighth Amendment claim, "a medical need is sufficiently serious if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'"  *Montanez*, 154 F.4th at 140 (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

As to the subjective element, a prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  The United States Court of Appeals for the Third Circuit recently described the deliberate indifference standard as follows:

> Negligence, even gross negligence, is not enough.  A prison official must be at least subjectively reckless.  That means he must consciously disregard a substantial risk of serious harm to the prisoner.  He must both be aware of the relevant facts and actually draw the inference that the prisoner faces such a risk.  If the official is not even conscious of the facts or the risk, his neglect cannot amount to punishment.

*DiFraia v. Ransom*, 171 F.4th 622, 628-29 (3d Cir. 2026) (quotation marks and citations omitted).  Additionally, as to the prison official's behavior, "[i]ndifference requires more than

just making the wrong judgment call or failing to prevent harm.  And in the specific context of prison medical care, it is not enough that a prisoner or another doctor would prefer a different approach than the one corrections officials took."  *Id.* at 629.  "For better or worse, prisoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, or even very good."  *Id.* (quoting *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1277 (11th Cir. 2020)).  In other words, "the Eighth Amendment does not create a general constitutional tort of prison negligence.  It requires subjective blameworthiness as well as serious mistreatment or neglect."  *Id.*

Deliberate indifference can be inferred from circumstantial evidence, and is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs."  *Montanez*, 154 F.4th at 141 (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017)).  Thus, "[n]ot every complaint of inadequate prison medical care rises to the level of deliberate indifference."  *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (*per curiam*).  Indeed, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."  *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).  Allegations of medical malpractice, negligence, and mere disagreement regarding the proper course of treatment are insufficient to establish a constitutional violation.  *Montanez*, 154 F.4th at 141 (citations omitted); *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (stating that

9

allegations of medical malpractice and mere disagreement as to proper medical treatment are insufficient to establish an Eighth Amendment violation).  The Court will address Allen's Eighth Amendment claims against each named Defendant in turn.

### 1.      Individual Capacity Claims Against Defendants Annino, Letizio, Bora, Ashley, Beverly

Allen's allegations concerning Defendants Annino, Letizio, Bora, Ashely, and Beverly do not reach the deliberate indifference level.  He avers that he submitted a sick call clip on September 25, 2024, because he had a severe case of "black discolored fungal toe nails, coupled with sever[e] ingrown toenail infection, and with a dire need to have several toe nails removed." ECF No. 1 at 4.  He states that he was brought to the medical department on October 3 in response to the sick call slip and was seen by Physician Assistant Annino. *Id.* at 5.  Annino examined his feet, "acknowledged the seriousness" of Allen's foot problems, and called Dr. Letizio for a consultation. *Id.*  According to Allen, Dr. Letizio told him that he would "never" see a podiatrist even if he filed a grievance or a lawsuit, and Dr. Letizio instructed Annino to trim Allen's toenails, which she did. *Id.*  Annino also clipped Allen's toenails on January 30. *Id.* at 7. As to Defendant Bora, a chronic care nurse, Allen alleges he met with her in the medical department on October 28, to discuss Allen's neuropathy symptoms. *Id.* at 6.  They discussed several oral medications and Bora ultimately prescribed Tileptal, 150 mg twice per day. *Id.* Allen contends that this medication is used in the treatment of seizures and was not effective for the treatment of his diabetes-related pain symptoms. *Id.*  As to Defendant Ashley, Allen alleges he met with her on March 12 for a chronic care clinic appointment, that she took his "vital signs, weight and etc.," and discussed Allen's diabetic-related illnesses with him. *Id.* at 9.  Defendant Ashley advised Allen of the results of his blood tests and denied Allen's request to be prescribed a diabetic diet, although she authorized the continued use of a cane and wheelchair. *Id.*  Allen

10

states that he was seen by Defendant Beverly, a physician's assistant, on February 17, who informed him that lab work was scheduled for February 27 and that he was scheduled for chronic care clinic on March 1, at which time they would address all of the concerns detailed in his January 26 sick call slip. *Id.* at 7-8. Allen was again seen by Defendant Beverly on March 10 in response to a sick call slip. *Id.* at 9. Beverly discussed Allen's glucose and A1c levels with him, and told him that she would schedule him for a chronic care clinic appointment and that he could further discuss his concerns then. *Id.* When Allen met with Defendant Beverly again on May 12 in response to a sick call slip, he again requested to be seen by a podiatrist and a neurologist, and requested a prescription for neurontin pain medication. ECF No. 3 at 2. His requests were denied. *Id.* at 2-3.

As noted above, "prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227 (citation omitted). "[M]ere disagreement between the prisoner and medical personnel over the proper course of treatment" falls short of deliberate indifference. *Montanez*, 154 F.4th at 141 (citation omitted). For a claim of inadequate medical care, as opposed to a claim of a complete denial of medical care, courts will presume the treatment was proper and will require allegations that the treatment received violates professional standards of care in some extreme way. *DiFraia*, 171 F.4th at 629 (citation omitted). Again, "[t]hat means more than '[m]ere medical malpractice.'" *Id.* (alteration in original) (quoting *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990)).

Allen takes issue with care decisions made by Defendants Annino, Letizio, Bora, Ashely, and Beverly, primarily contending that he should have been referred to a podiatrist and/or neurologist and that the medication, and other treatment, prescribed to him was ineffective. The Complaint simply does not support a reasonable inference that, at the time each Defendant was

11

treating Allen, the Defendant knew of and disregarded an excessive risk to Allen's health or safety such that the Defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and the Defendant drew the inference. *See Farmer*, 511 U.S. at 837. Instead, Allen's allegations regarding Defendants Annino, Letizio, Bora, Ashely, and Beverly reflect that each of these Defendants exercised their medical judgment in treating him and show, at most, the kind of disagreement regarding the care provided that is insufficient to support Eighth Amendment claims. As the Third Circuit has explained, "[i]ndifference requires more than just making the wrong judgment call or failing to prevent harm" and "it is not enough that a prisoner . . . would prefer a different approach than the one corrections officials took." *DiFraia*, 171 F.4th at 629. Here, Allen's claims amount to a disagreement between Allen and medical personnel over the proper course of treatment.

Further, it bears repeating that "[d]eliberate indifference requires obduracy and wantonness – not merely professional negligence." *Johnson v. Doe*, No. 23-3230, 2024 WL 4432083, at *3 (3d Cir. Oct. 7, 2024) (citing, *inter alia*, *Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.")); *see also White*, 897 F.2d at 108 ("Mere medical malpractice cannot give rise to a violation of the Eighth Amendment."). Allen's allegations do not plausibly raise an inference that the treatment he received from Defendants Annino, Letizio, Bora, Ashely, and Beverly "violates professional standards of care in some extreme way." *See DiFraia*, 171 F.4th at 629. Accordingly, Allen has failed to plead a plausible Eighth Amendment claim based on the conduct of Defendants Annino, Letizio, Bora, Ashely, or Beverly. *See, e.g.*, *Young v. Hallman*, No. 24-1920, 2026 WL 990830, at *2 (3d Cir. Apr. 13, 2026) (*per curiam*) (affirming dismissal of medical deliberate indifference

claims and noting that "dissatisfacti[on] with the course of treatment . . . received is insufficient to establish an Eighth Amendment deliberate indifference claim").

### 2. Individual Capacity Claims Against Defendants Terra, Hensley, and Huner

Allen includes Superintendent Terra, Deputy Superintendent Hensley, and Correctional Health Care Supervisor Huner as Defendants to this matter. ECF No. 1 at 2-3. He avers that Superintendent Terra is "legally responsible for and the overseer for all administrative duties, care, custody, and activities of the staff at the facility, and is responsible for employing professional and competent personnel." *Id.* at 2. Allen contends that Deputy Superintendent Hensley "is legally responsible for the overall security of the medical staff, their duties, and activities, and is in charge of transportation and arrangements of prisoners to appointments outside of the prison when prisoners need[] specialized medical treatment, care, and/or evaluations and oversee[s] the entire medical staff and etc." *Id.* As to Correctional Health Care Administrator Huner, Allen states that Huner "is generally responsible for ensuring the provision of medical care to prisoners and specifically for scheduling medical appointments outside the prison when a prisoner needs specialized treatment, care, or evaluations. And is the overseer and the administrator of the medical department and staff." *Id.* at 3.

To state a § 1983 claim, a plaintiff must allege how each defendant was personally involved in the events and occurrences giving rise to the claims brought against that defendant. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode*, 845 F.3d at 1207). "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the

13

circumstances surrounding a case, the knowledge must be actual, not constructive." *Id.* (citation omitted).

"Allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020). Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)). A plaintiff cannot predicate liability for a § 1983 claim on a *respondeat superior* basis. *Chavarriaga*, 806 F.3d at 227 (citing *Rode*, 845 F.2d at 1207). Instead, in § 1983 actions, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).

There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586

14

(3d Cir. 2004) (alteration in original)).[5]  The second way a supervisor may be personally liable for unconstitutional acts taken by subordinates is if "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.*

Here, Allen seeks to impose liability upon Terra, Hensley, and Huner based on general allegations that they are in charge of operations at SCI Phoenix, which he cannot do. *See Saisi*, 822 F. App'x at 48.  Because he has presented no allegations regarding their conduct, it follows that he has not presented a plausible supervisory liability claim. *See Iqbal*, 556 U.S. at 678; *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) ("A plaintiff cannot survive dismissal just by alleging the conclusion to an ultimate legal issue."); *see, e.g.*, *Jankowski v. Lellock*, 649 F. App'x 184, 188 (3d Cir. 2016) (affirming dismissal of failure-to-train claim "relegated to a single sentence in the complaint" as "merely a rote recitation of a cause of action coupled with a legal conclusion" that was insufficient to satisfy the pleading standard).

Moreover, a supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisor prison official.  *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that supervisory liability claim, including failure to train, was meritless where the plaintiff failed to make a plausible showing of an underlying constitutional violation at the hands of subordinates (citing, *inter alia*, *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010)).  To the extent that Allen asserts supervisory liability claims based on an act of a subordinate official,

---

[5]     "Failure to" claims, such as a failure to train, failure to discipline, or failure to supervise, are generally considered a subcategory of policy or practice liability. *Barkes*, 766 F.3d at 316-17 (citation omitted).

because the Court has determined that there are no plausible underlying Eighth Amendment claims, Terra, Hensley, and Huner may not be held liable under this type of theory either.

It also bears noting that Terra, Hensley, and Huner are non-medical prison officials who were entitled to rely on the medical judgment of the doctors and other medical professionals who treated Allen. *See Spruill*, 372 F.3d at 236 ("Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor."); *Stewart v. Pa. Dep't of Corr.*, 677 F. App'x 816, 819 (3d Cir. 2017) (*per curiam*) (affirming dismissal of claims where plaintiff "claimed that these Defendants, supervisory officials who do not participate in individual medical care decisions, simply failed to intervene in his medical care" because "[s]uch a claim is not viable under the Eighth Amendment"). Thus, nothing in Allen's Complaint suggests a plausible basis for a deliberate indifference claim against Terra, Hensley, or Huner.[6]

### 3. Official Capacity Claims

Allen indicates in the Complaint that Defendants are sued in their official capacities. *See* ECF No. 1 at 4. "Official capacity claims are indistinguishable from claims against the

---

[6]    Further, to the extent Allen seeks to hold Superintendent Terra liable for an Eighth Amendment claim based on his role in the grievance process, such claim fails. A prison official's involvement in the grievance process is generally not sufficient to allege liability under § 1983 for the events that gave rise to the grievance. *See Dooley*, 957 F.3d at 374 (affirming dismissal of Eighth Amendment claim where the only personal involvement alleged is the review and denial of the grievance); *see also Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*) ("Contrary to Robinson's assertions, awareness of a grievance or complaint after the allegedly unconstitutional conduct has occurred, without more, is insufficient to establish personal involvement." (citation omitted)); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]." (citation omitted)).

governmental entity that employs" the defendant. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). While Allen does not specify by whom the named Defendants are employed, it appears that some, if not all are employed by the Pennsylvania Department of Corrections ("DOC"). The Commonwealth of Pennsylvania and its agencies, including the DOC, are not "persons" who may be liable under 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64-66 (1989); *Endrikat v. Little*, No. 23-2167, 2023 WL 8519196, at *3 (3d Cir. Dec. 8, 2023) (*per curiam*) (affirming finding that Pennsylvania DOC is not subject to suit under § 1983 (citing, *inter alia*, *Curtis v. Everette*, 489 F.2d 516, 521 (3d Cir. 1973))). Additionally, the Eleventh Amendment bars suits seeking money damages against a state and its agencies in federal court when the state has not waived that immunity and the Commonwealth has not waived that immunity. *See Will*, 491 U.S. at 66; 42 Pa. Cons. Stat. § 8521(b); *see also Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 309-10 (3d Cir. 2020) ("Eleventh Amendment immunity bars actions for retroactive relief against state officers acting in their official capacity." (citation omitted)). Accordingly, all official capacity claims against DOC employees will be dismissed.

To the extent that any of the named Defendants are not DOC employees, but rather, employees of Wellpath Medical, the private company contracted to provide medical services at SCI Phoenix, Allen still has failed to plausibly plead an official capacity claim.[7] Although a private corporation under contract to provide medical services at a jail or prison may be liable

---

[7]    The Court notes that Wellpath was discharged from liability by the United States Bankruptcy Court for the Southern District of Texas, Houston Division, for claims seeking money damages that arose prior to November 11, 2024. *See In Re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tx.), ECF Nos. 2596, 2679, 2680; *see also* 11 U.S.C. § 524(a)(2) ("A discharge in a [Chapter 11 bankruptcy] case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.").

under § 1983 in certain circumstances, the United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (*per curiam*) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)).  Rather, to hold a private health care company like Wellpath liable for a constitutional violation under § 1983, a plaintiff must allege that Wellpath had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d at 583-84 (citing *Bd. of the Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)); *see also Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." (citations and quotations omitted)).  A plaintiff may also state a basis for liability against an entity like Wellpath by "alleging failure-to-supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).  In the context of a contract medical provider, the provider's "failure to train or supervise must amount to a policy or custom in disregard of an obvious risk that its employees or agents would commit constitutional violations." *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 526 (M.D. Pa. 2017), *aff'd in part, vacated in part on other grounds sub nom., Ponzini v. Monroe County*, 789 F. App'x 313 (3d Cir. 2019).

Allen does not tie any of the claimed violations of his constitutional rights to a Wellpath policy or custom, or to Wellpath's failure to train or supervise its staff.  Instead, Allen's claims

18

are solely based on the actions of Defendants Annino, Letizio, Bora, Ashely, and Beverly, who he alleges failed to provide him with adequate medical care.  Assuming *arguendo* that some or all of the named medical provider Defendants are Wellpath employees rather than DOC employees, because Wellpath cannot be responsible for its employees' acts under a theory of *respondeat superior* or vicarious liability, Allen's official capacity claims against Defendants Annino, Letizio, Bora, Ashely, and Beverly also will be dismissed.  In any event, as Allen has not pled an underlying constitutional violation, any official capacity claims fail for this reason as well.

### B.       State Law Claims

Because the Court has dismissed Allen's federal claims, the Court will not exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over any state law claims.  Accordingly, the only independent basis for jurisdiction over any such claims is 28 U.S.C. § 1332(a), which grants a district court jurisdiction over a case in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."

Section 1332(a) requires "'complete diversity between all plaintiffs and all defendants,'" which "means that, unless there is some other basis for jurisdiction, no plaintiff may be a citizen of the same state as any defendant." *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 104 (3d Cir. 2015) (quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) and *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) (internal footnotes omitted)).  An individual is a citizen of the state where he is domiciled, meaning the state where he is physically present and intends to remain.  *See Washington v. Hovensa*, LLC, 652 F.3d 340, 344 (3d Cir. 2011).  "[T]he domicile of a prisoner before his imprisonment presumptively remains his domicile during his imprisonment." *Pierro v. Kugel*, 386 F. App'x 308, 309 (3d Cir. 2010).  It is

19

the plaintiff's burden to establish diversity of citizenship. *Gibbs v. Buck*, 307 U.S. 66, 72 (1939); *see also Quaker State Dyeing & Finishing Co., Inc. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1143 (3d Cir. 1972) (stating that, in diversity cases, the plaintiff must demonstrate complete diversity between the parties and that the amount in controversy requirement has been met).

Allen has not met his burden. Allen does not allege the citizenship of the parties. Rather, he provides only the address of SCI Phoenix for himself and is suing Pennsylvania officials and medical staff at SCI Phoenix, which suggests that diversity is lacking. Accordingly, he has not sufficiently alleged that the parties are diverse for purposes of establishing the Court's jurisdiction over any state law claims he intends to pursue, so all state law claims will be dismissed for lack of subject matter jurisdiction. The dismissal will be without prejudice to Allen refiling his state law claims in state court, where federal jurisdiction will not be an issue.[8] *See N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 n.8 (3d Cir. 2011) (explaining that dismissals for lack of subject matter jurisdiction are "by definition without prejudice" (citation omitted)). Allen is advised that the period of limitations for the state law claims was tolled during the pendency of this action and "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.")

## IV.    CONCLUSION

The Court will grant Allen leave to proceed *in forma pauperis* and grant his motion to file an amended complaint, such that ECF No. 1 and ECF No. 3 will comprise the Complaint. However, the Complaint will be dismissed upon statutory screening. All federal law claims will

---

[8]    The Court expresses no opinion on the merits of any state law claims.

be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. Under the circumstances of this case, leave to amend will not be given, as amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). All state law claims will be dismissed without prejudice for lack of subject matter jurisdiction. Because the Complaint will be dismissed on statutory screening for failure to state a claim, the motion for appointment of counsel will be denied as moot. *See Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993) (stating that in determining whether appointment of counsel is appropriate, the court should first determine whether plaintiff's lawsuit has a legal basis).

An appropriate Order regarding dismissal follows, which shall be entered separately. *See* Fed. R. Civ. P. 58(a).

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
**JOSEPH F. LEESON, JR.**
**United States District Judge**